**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEO YEN, Individually And<br>On Behalf of All Others Similarly Situated,<br><br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>XINHUA FINANCE MEDIA LTD., FREDY<br>BUSH, SHELLY SINGHAL, ZHU SHAN,<br>GRAHAM EARNSHAW, ALOYSIUS T.<br>LAWN, JOHN H. SPRINGER, ZHAO LI,<br>LONG QIU YUN, J.P. MORGAN SECURITIES,<br>INC., UBS AG, CIBC WORLD MARKETS<br>CORP., WR HAMBRECHT + CO., LLC<br><br>　　　　　　　Defendants. | CIVIL ACTION NO. 07 CIV 4046<br><br><br>**CLASS ACTION COMPLAINT**<br>**FOR VIOLATIONS OF**<br>**FEDERAL SECURITIES LAWS**<br><br><br><br>**JURY TRIAL DEMANDED** |

## NATURE OF THE ACTION

1.　　　This is a class action brought on behalf of purchasers of shares of Xinhua Finance

Media Ltd. ("Xinhua" or "Company") in, or traceable to, the March 9, 2007, Initial Public

Offering ("IPO" or the "Offering") of 23.076 million American Depositary Shares ("ADS").[1]  In

connection with this Offering - - of which 17.307 million ADS shares were sold by the Company

and of which 5.769 million ADS shares were sold by Company insiders - - defendants raised gross

proceeds of at least $300 million.

---

1.  Each ADS represents two (2) shares of Xinhua common stock.

2.     Xinhua, its entire Board of Directors and the Underwriters involved in the Offering (including, J.P. Morgan Securities Inc., UBS AG, CIBC World Markets Corp. and WR Hambrecht + Co., LLC ), are each charged with including or allowing the inclusion of materially false and misleading statements in the Registration Statement and Prospectus issued in connection with the March 2007 IPO, in direct violation of the Securities Act of 1933.  Specifically, defendants each failed to conduct an adequate due diligence investigation into the Company prior to the IPO, and they also each failed to reveal that, at the time of the IPO, the Company's CFO, Shelly Singhal, was simultaneously an investment banker and stockbroker in charge of Bedrock Securities ("Bedrock") and, that since April 2006, prior to the IPO, Bedrock had been under a "Cease-and-Desist" order by the National Association of Securities Dealers ("NASD") - - that exchanges self regulatory body - - for violating SEC regulations.  Moreover, at the time of the IPO, it also now appears that defendants also failed to reveal that defendant Singhal was defending private charges of civil racketeering in a lawsuit in California, or that he had previously acted as a major investor in several other companies that had also previously been sued for fraud by investors.

3.     It was only on May 21, 2007, however, that investors learned the truth about the Company after *Barron's* reported an expose about Singhal, and after shares of the Company opened to a new trading low of $8.31 per share - -  a decline of over 36% compared to the March 2007 Offering price of $13.00 per share.  Investors' shock related to the reports about defendant Singhal were compounded by *Barron's* report that the head of research at the Company's Glass Lewis subsidiary, Lynn E. Turner, and its managing director and research editor, Jonathan Weil, had both resigned from the subsidiary in protest over defendants' material Prospectus omissions.

4.     The importance of these resignations to investors cannot be understated because, according to *Barron's*, prior to joining Glass Lewis, Lynn E. Turner had been, arguably, the best

2

accounting regulator to serve at the Securities and Exchange Commission. Jonathan Weil, who also resigned, had previously served as staff member of the *Wall Street Journal*, where he was nationally recognized for being the first reporter to blow the whistle on Enron. Upon resignation, Weil stated that, ***"I am uncomfortable with and deeply disturbed by the conduct, background and activities of our new parent company Xinhua Finance Ltd., its senior management, and its directors. To protect my reputation, I no longer can be associated with Glass Lewis or Xinhua Finance."***

5.     Most shocking of all, however, was the statement in the *Barron's* repot that indicated that the Company and its CEO had known of defendant Singhal's legal problems prior to the March 2007 IPO, and had withheld this information from investors. Again, according to this report, when specifically asked if she'd known about the NASD action against Singhal's brokerage firm when putting together a prospectus for Xinhua Finance Media that omitted these facts, and "after a long speech about how she had relied on the best advice of the company's underwriters and lawyers," the Company's CEO, defendant Bush, acknowledged that, "yes," she had known about the NASD problems of Singhal's brokerage firm, and that she, the Company and its Underwriters and advisors omitted this material disclosure.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under §§11 and 15 of the Securities Act of 1933 (the "Securities Act"). Jurisdiction is conferred by §22 of the Securities Act. Venue is proper pursuant to §22 of the Securities Act, as defendant Xinhua and/or the Individual Defendants and Underwriter Defendants - - J.P. Morgan, UBS AG, CIBC World Markets and WR Hambrecht + Co. - - conduct business in, and the wrongful conduct took place in this District. Moreover, Xinhua ADS shares were ultimately listed for trading on the NASDAQ Market Exchange, also based in this District.

Finally, the individual defendants conduct business in and many of the acts giving rise to the violations complained of herein took place in this District.

## THE PARTIES

### Plaintiff

7.      Plaintiff **LEO YEN** purchased shares of Xinhua shares pursuant and/or traceable to the Company's materially false and misleading Registration Statement and Prospectus issued by defendants in connection with the March 2007 IPO, including those shares detailed in the attached Certification, incorporated herein by reference, and was damaged thereby.

### Corporate Defendant

8.      Defendant **XINHUA FINANCE MEDIA, LTD.** is a corporation organized under the laws of the Cayman Islands, and headquartered in Shanghai, China.   According to the Company's Yahoo.com profile, Xinhua operates as a diversified media company in the People's Republic of China. The Company operates in five divisions: Media Production, Broadcasting, Print, Advertising, and Research.  The Media Production division operates in-house production studios that create and produce various programs, including business, entertainment, educational, and animation shows. The Broadcasting division engages in the distribution of its programming through Inner Mongolia Satellite Television; production and syndication of the Fortune China series of financial programs, including Fortune Morning 7 a.m., a popular financial news program in China; and production and distribution of bilingual content for China Radio International's EasyFM stations in Beijing and Shanghai. The Print division has the right to sell advertising and provides management and information consulting services to Money Journal magazine and the Economic Observer newspaper.

4

The Advertising division operates an advertising agency that creates and places advertising for television, print media, and campus billboards. This division also purchases the rights to be an advertising agent for television shows broadcast by Beijing Television Station and other television stations; and in the Beijing, Shanghai, and Tianjin real estate pages of the Economic Observer, as well as other newspapers. The Research division operates a market research group that provides research services on products, advertisements, and markets that include market characteristics, consumer preferences, and opinions with respect to advertising and media content, and business and technology issues as needed for each project.

9.     The individuals identified as defendants in subparagraphs (a) - (h) below, are referred to collectively herein as the "Individual Defendants." The Individual Defendants are each liable for the false statements contained in, and omissions from, the materially false and misleading Registration Statement and joint Proxy/Prospectus, as alleged herein, as those statements were "group-published" information. The Individual Defendants include the following:

(a)     Defendant **FREDY BUSH** ("Bush") was and is Chief Executive Officer and Chairman of the Board of Directors of the Company. Defendant Bush signed the materially false and misleading Registration Statement and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO. Also in connection with this IPO, defendant Bush sold at least 1.5 million shares of her personally held Xinhua shares to reap over **$19.5 million** in gross proceeds.2

(b)     Defendant **SHELLY SINGHAL** ("Singhal") was at the effective time of the

---

2  In addition, an entity named as Dragon Era Group Ltd., and reported to be owned by Fredy Bush's family trust also appeared to sell an additional 1.5 million IPO shares to reap an additional $19.5 million in connection with the March 2007 IPO.

IPO, Chief Financial Officer and a member of the Board of Directors of the Company. Defendant Singhal aided in the preparation and filing of the Company's materially false and misleading Registration Statement and Prospectus filed and issued in connection with the March 2007 IPO. Also, in connection with this IPO defendant Singhal sold over **$13.49** million of Company shares that he owned or controlled.

(c)    Defendant **ZHU SHAN** is, and at the effective time of the IPO was, Chief Operating Officer and a member of the Board of Directors of the Company. Defendant Shan aided or assisted in the preparation and filing of the Company's materially false and misleading Registration Statement, and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.

(d)    Defendant **GRAHAM EARNSHAW** is, and at the effective time of the IPO was, President, Editorial and a member of the Board of Directors of the Company. Defendant Earnshaw aided or assisted in the preparation and filing of the Company's materially false and misleading Registration Statement, and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.

(e)    Defendant **ALOYSIUS T. LAWN** is, and at the effective time of the IPO was, a member of the Board of Directors of the Company. Defendant Lawn aided or assisted in the preparation and filing of the Company's materially false and misleading Registration Statement, and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.

(f)    Defendant **JOHN H. SPRINGER** is, and at the effective time of the IPO was, a member of the Board of Directors of the Company. Defendant Springer aided or assisted in the preparation and filing of the Company's materially false and misleading Registration Statement, and

6

filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.

(g)    Defendant **ZHAO LI** is, and at the effective time of the IPO was, a member of the Board of Directors of the Company. Defendant Li aided or assisted in the preparation and filing of the Company's materially false and misleading Registration Statement, and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.

(h)    Defendant **LONG QIU YUN** is, and at the effective time of the IPO was, Chief Operating Officer and a member of the Board of Directors of the Company. Defendant Yun aided or assisted in the preparation and filing of the Company's materially false and misleading Registration Statement, and filed with the SEC the materially false and misleading Prospectus issued in connection with the March 2007 IPO.

**IPO Underwriter Defendants**

10.    In connection with the March 2007 Initial Public Offering, the following investment banks acted as "Underwriters" and/or "Global Coordinators" or "Bookrunners" of the Offering - - distributing over 23.076 million shares of Xinhua stock to investors and initiating the first public market for Xinhua shares. Excluding the oversubscription allotment of an additional 3.461 million shares to be sold by Company and insiders, the distribution of the Xinhua shares awarded Underwriters in the IPO occurred, as follows:

| Name | Number of ADSs |
|---|---|
| Defendant J.P. Morgan Securities Inc. | 13,846,153 |

| | |
|---|---|
| Defendant UBS AG | 6,923,077 |
| Defendant CIBC World Markets Corp. | 923,077 |
| Defendant WR Hambrecht + Co., LLC | 923,077 |
| Non Party ABN AMRO Bank N.V., Hong Kong Branch and N M Rothschild & Sons(Hong Kong) Limited, each trading as ABN AMRO Rothschild.[3] | 461,539 |
| **TOTAL** | **23,076,923** |

11.    In connection with the March 2007 IPO, the Underwriter Defendants were paid approximately $21 million in gross fees - - paid indirectly by purchasers of the Company's shares. The Underwriter Defendants were paid at least $0.91 per share in connection with the sale of the 23.076 million shares, not including shares sold pursuant to the exercise of the Underwriter's over-subscription option, as follows:

| | Per ADS | Total |
|---|---|---|
| Initial public offering price | $ 13.00 | $ 299,999,999 |
| Underwriting discounts and commissions | $ 0.91 | $ 21,000,000 |
| Proceeds to Xinhua Finance Media, before expenses | $ 12.09 | $ 209,252,789 |
| Proceeds to the selling shareholders, before expenses | $ 12.09 | $ 69,747,210 |

12.    Shareholders were willing to, and did, pay at approximately $21.0 million in combined fees to compensate the Underwriter Defendants for conducting a purported significant

_____

3 As a result of the relatively smaller number of shares that ABN AMRO distributed in the Offering, and because these shares were primarily distributed by AMB AMRO to investors outside the United States, this Underwriter has not, at this time, been named as an Underwriting defendant herein.

8

"due diligence" investigation into Xinhua in connection with the IPO. The Underwriter Defendants' due diligence investigation was a critical component of the Initial Public Offering, and this was supposed to provide investors with important safeguards and protections.

13.    The due diligence investigation that was required by the Underwriter Defendants included a detailed investigation into Xinhua sales, accounting, controls, procedures and it also required defendants to conduct background checks for each of the members of the Board and for senior officers of the Company, to the extent a reasonable investor would. A reasonable due diligence investigation would have extended well beyond a mere casual view of Xinhua books, records and the resumes of the individual defendants. The failure of the Underwriter Defendants to conduct an adequate due diligence investigation was a substantial contributing factor leading to the harm complained of herein.

14.    In addition to the foregoing, because of the Underwriter Defendants' and Individual Defendants' positions with the Company, they each had access to the adverse undisclosed information about Xinhua's officers and directors *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith and/or other information that would have reasonably been uncovered in connection with an adequate and reasonable due diligence investigation into the backgrounds of the Company's key officers and directors.

15.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq stock market exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws,

the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company and its officers and directors, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions made in connection with the issuance of approximately $300 million ADS shares in March 2007, violated these specific requirements and obligations.

16.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company at the time of the March 2007 Offering. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

### MATERIALLY FALSE & MISLEADING STATEMENTS
### IN THE REGISTRATION STATEMENT AND PROSPECTUS

17.     On March 9, 2007, Xinhua completed the sale of 23,076,923 ADS shares priced at $13.00 per share to raise gross proceeds of approximately $300 million. Of these shares, 17,307,923 were sold by the Company and 5,769,000 were sold by certain selling shareholders, including defendants Bush and Singhal. These shares priced directly in the middle of the $12.00 to $14.00 range for this market debut and, the day of the Xinhua IPO, defendant Bush rang the closing bell on the Nasdaq.

18.     Moreover, the same day these shares were sold to the public, defendants also filed a copy of the Company's Prospectus with the SEC, pursuant to Form 424B4. Unbeknownst to investors, however, at that time, defendants failed to disclose that defendant Singhal, the Company's

Chief Financial Officer and a member of the Board of Directors of the Company was owner of a small brokerage firm in California that had been the subject of a serious state and regulatory proceedings that impacted directly on his ability to serve as an officer or director of a public corporation. These serious and material adverse proceedings have been so far identified by the media to include, in part, the following:

- A "Cease and Desist" Order issued by the National Association of Securities Dealers in April 2006, pending its total suspension, for violation of several SEC rules, related to Newport Beach, California based Bedrock Securities ("Bedrock"). At the time the IPO Prospectus was filed, defendants Singhal was simultaneously the Company's CFO, and an investment banker and stockbroker who owned and controlled Bedrock.

- At the time of the Xinhau IPO, defendant Singhal was defending a suit filed in California that alleged that he had engaged in civil racketeering and organized corruption, in a RICO action related to certain his other, undisclosed investment activities.

- That, prior to becoming an early investor in Xinhua, in 2003, defendant Singhal was also a "major investor" in three other companies, including iMergent, AremisSoft and ACLN, several of which have been described by the media as "outrageous frauds," and which have resulted in class action shareholder litigation, among other legal or regulatory actions.

19.    Rather than disclose these material adverse facts, defendants disseminated to investors and filed with the SEC a materially false and misleading Registration Statement and Prospectus that stated little more about defendant Singhal, than the following:

> **Shelly Singhal** has served as *our Chief Financial Officer since September 2006, and has served as a director of our parent, Xinhua Finance Limited, since July 2004*. Mr. Singhal will serve as our director, commencing from the Securities and Exchange Commission's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part.
>
> Mr. Singhal sits on the Compensation Committee, Audit Committee and Investment Committee of our parent. Mr. Singhal founded the SBI Group, an investment company, in June 2001, serving as its Managing Director until December 2003, and as Chairman and CEO since that time. Mr. Singhal has also served as a director and member of the Compensation Committee of Small World Kids Inc. since October 2004. *Mr. Singhal owns Bedrock Securities, a NASD licensed broker dealer and its sister company, Bedrock China Futures, Ltd., which is an Asian securities*

11

*trading company.* Mr. Singhal worked for SBI-E2 Capital, a member of Softbank Investment Group, from 2001 to 2003. Mr. Singhal holds a B.S. degree in Business Administration from Seaver College at Pepperdine University. [Emphasis added.]

20.     The long-term association of defendants Singhal and Bush was also documented by

the Prospectus, as follows:

> *Fredy Bush* has been *our Chief Executive Officer and Chairman of the Board of Directors since our founding in November 2005. She has served as a director and Chief Executive Officer of our parent, Xinhua Finance Limited, since February 2004. Since June 2001 and January 2002, respectively, she has served as Vice Chairman and Chief Executive Officer of Xinhua Financial Network Limited*, or XFN, the predecessor to our parent. From 1987 to 2001, Ms. Bush operated a consulting business in Asia where she assisted clients in building business alliances, particularly between the United States and Asia and in the financial sector. Her consulting business worked in Taiwan from 1985 to 1990 to establish Taiwan's first official futures market. *Ms. Bush serves as a director for 27 subsidiaries or affiliates of our parent*, including EconWorld Media Limited. Ms. Bush serves on the board of Bush Corporation, Chazara Foundation, and Xinhua Finance Library Foundation Limited. Ms. Bush has received a number of awards, including being listed among the Wall Street Journal's Top 50 Women to Watch in 2004 and the Ellis Island Medal of Honor by the National Ethnic Coalition of Organizations in 2006. In 2006, she also received the Asia Entrepreneur of the Year Award from CNBC and a Woman of Influence Award for Entrepreneur of the Year by the American Chamber of Commerce in Hong Kong. [Emphasis added.]

21.     The importance of defendant Singhal to the oversight of the Company can also not be

understated.  Accordingly, the Prospectus identifies Singhal as a member of each of the three (3)

committees of the Board of Directors of the Company, including: (i) the Audit Committee; (ii) the

Compensation Committee; and (iii) the Corporate Governance and Nominating Committee.

22.     As a member of the Audit Committee, defendant Singhal was responsible to the

crucial oversight of Xinhua's accounting and financial reporting processes, and the audits of the

financial statements of the Company - - duties that are directly called into question by the credible

and serious allegations of RICO, fraud, and NASD and SEC regulatory violations.  These duties

specifically included, in part, the following:

    *    appointing, retaining and overseeing the work of the independent auditors, including resolving disagreements between the management and the independent auditors relating to financial reporting;

    *    pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

    *    reviewing annually the independence and quality control procedures of the independent auditors;

    *    discussing material off-balance sheet transactions, arrangements and obligations with the management and the independent auditors;

    *    reviewing and approving all proposed related party transactions;

    *    discussing the annual audited financial statements with the management;

    *    annually reviewing and reassessing the adequacy of our audit committee charter;

    *    meeting separately with the independent auditors to discuss critical accounting policies, management letters, recommendations on internal controls, the auditor's engagement letter and independence letter and other material written communications between the independent auditors and the management; and

    *    attending to such other matters that are specifically delegated to our audit committee by our board of directors from time to time.

23.    As a member of the Compensation Committee, defendant Singhal was also responsible for the oversight over the conduct and performance of other officers and directors of the Company, including defendant Bush - - again, duties that are directly called into question by the credible and serious allegations of RICO, fraud, and NASD and SEC regulatory violations. These duties specifically included, in part, the following:

    *    Reviewing and approving executive compensation;

     *      Reviewing periodically and managing any long-term incentive compensation plans, share option plans, annual bonuses, employee pension and welfare benefit plans;

     *      determining our policy with respect to change of control or "parachute" payments; and

     *      Managing and reviewing director and executive officer indemnification and insurance matters.

24.     As a member of the **Corporate Governance and Nominating** Committee, defendant Singhal was also responsible for the critical oversight of the conduct of the members of the Company, as well as its Board and senior management.  These duties specifically included, in part, the following:

     *      recommending to the board nominees for election or re-election to the board or for appointments to fill any vacancies;

     *      reviewing annually the performance of each incumbent director in determining whether to recommend such director for an additional term;

     *      overseeing the board in the board's annual review of its own performance and the performance of the management; and

     *      considering, preparing and recommending to the board such policies and procedures with respect to corporate governance matters as may be required to be disclosed under the applicable laws or otherwise considered to be material.

25.     In addition to the foregoing, the role of defendant Singhal as a member of the Board of Directors and as a member of each of the Boards oversight Committees was also critical to investors because the Prospectus clearly stated that one of the Company's key "Strengths," was its

purported "***Strong and Experienced Management Team***."  As evidence of this, the Prospectus also

stated, in part, the following:

> **Our strengths**
>
> **We believe we have the following competitive strengths:**
>
> *    *    *
>
> **Strong and experienced management team**
>
> ***Our management team is one of our strongest assets***. Our management team has a mix of Chinese cultural experience and international media operational skills, and brings international standards to our content offerings. Ms. Fredy Bush, our Chief Executive Officer and the Chairman of our Board, has 20 years of experience building businesses in Asia. In 2006, Ms. Bush received CNBC's Asia Entrepreneur of the Year Award. Ms. Bush***, together with our management team, focuses on innovative business and strategic initiatives and the execution of our business model.*** In addition, we employ experienced and capable managers to run our business groups and operations.  [Emphasis added]

26.    In addition to the foregoing, defendants' failure to disclose that the Company's CFO

had a history of stock fraud and market manipulation in addition to a history of securities related

abuses and regulatory actions, also had a significant adverse impact on investors' ability to

reasonably evaluate the purpose and effect of the Risk Disclosures contained in the Prospectus.  The

risk disclosures that were directly impacted by these material omissions included, in part, the

following:

> **Our business depends substantially on the continuing efforts of our key executives. Our business may be severely disrupted if we lose their services.**
>
> Our future success heavily depends upon the continued services of our key executives, particularly Fredy Bush, who is the Chief Executive Officer of our company. Our Chief Executive Officer also serves as the Chief Executive Officer of our parent company and will be required to devote a substantial amount of time in that capacity. We rely on the expertise of our key executives in business operations and the advertising and media industries and on their relationships with our shareholders, business partners and regulators. If one or more of our key executives

15

are unable or unwilling to continue in their present positions, we may not be able to replace them easily or at all. Therefore, our business may be severely disrupted, our financial condition and results of operations may be materially and adversely affected and we may incur additional expenses to recruit and train personnel. In addition, if any of these key executives joins a competitor or forms a competing company, we may lose customers and business partners, and our operating results may be adversely affected. Each of our executive officers has entered into an employment agreement with us that contains confidentiality and non-competition provisions. If any disputes arise between our executive officers and us, these agreements may not be enforced effectively.

**Our senior management and employees have worked together for a short period of time, which may make it difficult for you to evaluate their effectiveness and ability to address challenges.**

Due to our limited operating history, recent acquisitions of substantially all of our business operations and recent additions to our management team, certain of our senior management and employees have worked together at our company for only a relatively short period of time. As we acquired substantially all of our business operations recently, none of our senior management has worked with our operating groups for a substantial period of time. As a result of these circumstances, it may be difficult for you to evaluate the effectiveness of our senior management and other key employees and their ability to work with the employees of our operating groups and address future challenges to our business.

**If we are unable to attract, train and retain key individuals, highly skilled employees and important talent, our business may be adversely affected.**

We expect to need to hire additional employees, including personnel to maintain and expand our print productions, graphics designers and production personnel to create advertisements and produce programming, information technology and engineering personnel to maintain and expand our delivery platform, marketing personnel to sell our products, and administrative staff to support our operations. Some of our operating groups, especially our broadcasting group, also rely on the appearances of well-known personalities and talents during programming, such as the *Fortune China* programs. If we are unable to identify, attract, hire, train and retain individuals in these areas or retain our existing employees, due to our failure to provide them with adequate incentives or otherwise, the quality of our products and services may be negatively impacted, which could adversely affect our business and results of operations.

27.    Moreover, it was precisely because investors believed that these risk disclosures represented contingencies - - not present actualities related to the material omissions regarding

16

defendant Singhal and the foreseeable consequences thereof - -  that they were willing to pay a

considerable premium for shares of the Company at the time of the Offering.   In fact, according to

the Prospectus, investors paid a premium of over $8.00 per share, compared to the Company's

"Book Value" at that time, as follows:

> If you purchase ADSs in this offering, you will pay more for your ADSs than the
> amount paid by our existing shareholders for their ADSs on a per ADS basis. As a
> result, **you will experience immediate and substantial dilution of approximately
> $8.31 per ADS** (assuming no exercise by the underwriters of options to acquire
> additional ADSs), representing the difference between our net book value per ADS
> as of December 31, 2006, after giving effect to this offering, and the initial public
> offering price of $13.00 per ADS. In addition, you may experience further dilution to
> the extent that our ADSs are issued upon the exercise of share options. [Emphasis
> added.]

The following table illustrates such per share dilution:

| | |
|---|---|
| Initial public offering price per common share | $ 6.50 |
| Net book value per common share as of December 31, 2006 | $ 1.23 |
| Pro forma net book value per common share as of December 31, 2006 | $ 1.14 |
| Pro forma net book value per common share after giving effect to this offering | $ 2.34 |
| Amount of dilution in net book value per common share to new investors in this offering | $ 4.16 |
| Amount of dilution in net book value per ADS to new investors in this offering | $ 8.31 |

28.    According to the Prospectus, in connection with the March 2007 IPO the following

Company insiders sold at least 5.249 million shares of their privately held Company stock, as

follows:

17

The following table sets forth information with respect to the beneficial ownership, within the meaning of Rule 13d-3 under the Exchange Act, of our common shares, as of the date of this prospectus, by: (1) each of our directors and executive officers; (2) our principal shareholders; and (3) each selling shareholder. [Certain Notes Omitted]

| | Common shares Beneficially owned prior to this offering | | Common shares being sold in this offering | | Shares beneficially owned after this Offering | |
|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % |
| Directors and executive officers: | | | | | | |
| Fredy Bush(4) | 9,365,000 | 9.6% | 1,500,000 | 1.5% | 7,865,000 | 5.8% |
| Shelly Singhal(5) | 6,414,756 | 6.6% | -- | -- | 6,414,756 | 4.7% |
| Zhu Shan | 350,000 | 0.4% | -- | -- | 350,000 | 0.3% |
| Graham Earnshaw | 350,000 | 0.4% | -- | -- | 350,000 | 0.3% |
| Alex Fan | 147,093 | 0.2% | -- | -- | 147,093 | 0.1% |
| Teddy Liu Weidong | 68,430 | 0.1% | -- | -- | 68,430 | 0.1% |
| Yu Gang | 436,860 | 0.4% | -- | -- | 436,860 | 0.3% |
| Stephen Xie Wei | 1,780,799 | 1.8% | -- | -- | 1,780,799 | 1.3% |
| Aloysius T. Lawn | -- | -- | -- | -- | -- | -- |
| John H. Springer | -- | -- | -- | -- | -- | -- |
| Zhao Li | 5,817,905 | 6.0% | -- | -- | 5,817,905 | 4.3% |
| Long Qiu Yun | -- | -- | -- | -- | -- | -- |
| All directors and executive officers as a group | 24,730,843 | 25.3% | 1,500,000 | 1.5% | 23,230,843 | 17.1% |
| | | | | | | |
| Principal and selling shareholders: | | | | | | |
| Xinhua Finance Limited | 50,054,618 | 51.3% | -- | -- | 50,054,618 | 36.9% |
| Patriarch Partners Media Holdings, LLC | 19,139,655 | 19.6% | 9,000,000 | 9.2% | 10,139,655 | 7.5% |
| Sino Investment Holdings Limited(16) | 5,514,756 | 5.7% | -- | -- | 5,514,756 | 4.0% |
| Dragon Era Group Limited(17) | 9,365,000 | 9.6% | 1,500,000 | 1.5% | 7,865,000 | 5.8% |
| Zhao Li | 5,874,493 | 6.0% | -- | -- | 5,854,493 | 4.3% |
| Honour Rise Services Limited | 6,532,071 | 6.7% | -- | -- | 6,532,071 | 4.8% |
| Dennis L. Pelino Family Trust(19) | 5,514,756 | 5.7% | 1,038,000 | 1.1% | 4,476,756 | 3.3% |

(4)     Includes 9,365,000 class A common shares owned by Dragon Era Group Limited that are restricted. See "Description of share capital." The business address of Ms. Bush is Rooms 3905-3909, Tower 1, Grand Gateway, 1 Hongqiao Lu, Shanghai 200030 People's Republic of China. The 9,365,000 class A common shares held by Dragon Era Group Limited are subject to staggered lock-up periods ranging

up to five years from June 13, 2006 with 1,500,000 class A common shares vested when the Securities and Exchange Commission declared our registration statement on Form F-1, of which this prospectus is a part, effective. 2,210,000 will vest on June 13, 2008, 2,210,000 will vest on June 13, 2009, 2,210,000 will vest on June 13, 2010 and 1,235,000 will vest on June 13, 2011.

(5)    Includes 3,464,772 class A common shares and 2,049,984 class A common shares exercisable per warrants beneficially owned through Mr. Singhal's beneficial ownership of the equity of Sino Investment and 900,000 shares to be granted to Mr. Singhal as compensation at the time of the offering. The shareholders of Sino Investment are Mr. Singhal and Sino (US) LLC. Mr. Singhal holds 89.4% of the equity of Sino (US) LLC. The business address of Mr. Singhal is Suite 2003-2005 Vicwood Plaza, 199 Des Voeux Road Central, Hong Kong. Sino Investment has identified itself to us as an affiliate of a broker-dealer and has represented to us that it purchased the securities in the ordinary course of business and at the time of such purchase, it had no agreement or understanding, directly or indirectly, with any person to distribute the securities.

*    *    *

(16)    Includes 3,464,772 class A common shares and 2,049,984 class A common shares that may be issued upon the exercise of warrants. The shareholders of Sino Investment are Mr. Shelly Singhal and Sino (US) LLC, who share investment and voting power over the shares held by Sino Investment. The registered address of Sino Investment is Charlotte House, Charlotte Street, P.O. Box N-341, Nassau, Bahamas. Mr. Singhal holds 89.4% of the interest of Sino (US) LLC. Sino Investment has identified itself to us as an affiliate of a broker-dealer and has represented to us that it purchased the securities in the ordinary course of business and at the time of such purchase, it had no agreement or understanding, directly or indirectly, with any person to distribute the securities. Sino Investment has held these shares and warrants since September 22, 2006. Sino Investment also owned the shares and warrants now belonging to the Dennis L. Pelino Family Trust, which were transferred on January 29, 2007.

(17)    Shares are class A common shares that are restricted, Dragon Era Group Limited is owned by Fredy Bush's family trust. The business address of Dragon Era Group Limited is 31/F, The Center, 99 Queens Road Central, Hong Kong. 1,500,000 of these shares vested upon the Securities and Exchange Commission's declaration of effectiveness of our registration statement on Form F-1, of which this prospectus is a part. 2,210,000 will vest on June 13, 2008, 2,210,000 will vest on June 13, 2009, 2,210,000 will vest on June 13, 2010 and 1,235,000 will vest on June 13, 2011. Fredy Bush was initially granted 11,050,000 restricted shares, the majority of which were transferred to Dragon Era on November 30, 2006, and others of which were transferred to other persons on November 20 and December 20, 2006.

19

(19)    Includes 3,464,772 class A common shares and 2,049,984 class A common shares that may be issued upon the exercise of warrants. The trustee is Mr. Dennis Pelino, who has investment and voting power over the shares held by the trust. The registered address of the trust is 118 West 4 th Court, Miami, FL 33139. Mr. Pelino is an independent director of our parent, Xinhua Finance Limited, and serves on its audit, compensation and investment committees. Mr. Pelino also serves on the board of Xinhua Financial Network Limited. These shares and warrants were transferred from Sino Investment on January 29, 2007.

### The Truth About
### Xinhua is Belatedly Disclosed

29.    On May 18, 2007, after the close of trading, Xinhua surprised investors by announcing that defendant Singhal had suddenly resigned from the Board of the Company, and the board of its parent, effective immediately.   At that time, defendants published a release that explained Singhal's unscheduled departure as related to certain "other priorities," in part, as follows:

Xinhua Finance Board Announcement
Friday May 18, 7:35 pm ET

SHANGHAI, May 18 /PRNewswire-FirstCall/ -- The Boards of Directors of Xinhua Finance Ltd. (TSE: 9399 - News; OTC ADRs: XHFNY) and Xinhua Finance Media (Nasdaq: XFML - News), announced today that Mr. Shelly Singhal has resigned from the Boards of both companies, as well as from all executive and managerial positions. His departure is immediate.

"Mr. Singhal provided important assistance throughout the development of Xinhua Finance Ltd. and Xinhua Finance Media," commented Chairman and CEO Fredy Bush, "He remains a strong supporter of both companies, and he has our thanks for his tireless efforts in contributing to our successes to date."

"It is a difficult decision to leave these two Companies that I have helped to grow, but there are other priorities that will require my full attention, so it is clearly the right thing to do now," Mr. Singhal wrote in a letter to the Boards, "There is a deep pool of entrepreneurial and managerial talent in place to insure continued progress. I remain a loyal and long-term follower and shareholder, and wish the two Companies well."

30.    Adding further investor shock and confusion, the following day, Saturday, May 19, 2007, at 5:19 am Eastern Standard Time, defendants published a second release related to the immediate departure of Singhal, which again talked about the important contribution he had made to the Company, but which then added curious language stating that Singhal was "currently the subject of a civil suit which is unrelated to Xinhua." This release stated the following:

> Xinhua Finance Board Announcement
> Saturday May 19, 5:19 am ET
>
> SHANGHAI, May 19 /Xinhua-PRNewswire/ -- Xinhua Finance Ltd. (TSE: 9399News OTC ADRs: XHFNY) and Xinhua Finance Media (Nasdaq: XFML - News) announced today that Mr. Shelly Singhal has resigned from the Boards of both companies, as well as from all executive and managerial positions. His departure is immediate.
>
> "Mr. Singhal provided important assistance throughout the development of Xinhua Finance Ltd. and Xinhua Finance Media," commented Chairman and CEO Fredy Bush, "He remains a strong supporter of both companies, and he has our thanks for his tireless efforts in contributing to our successes to date."
>
> "It is a difficult decision to leave these two companies that I have helped to grow. Unfortunately, recent allegations against me in the press concerning my activities prior to joining Xinhua Finance have created a situation where my continued involvement with Xinhua Finance has become a distraction to management, so it is clearly the right thing to do now," Mr. Singhal commented. "There is a deep pool of entrepreneurial and managerial talent in place to insure continued progress. I remain a loyal and long-term follower and shareholder, and wish the two companies well."
>
> Mr. Singhal is currently the subject of a civil suit which is unrelated to Xinhua Finance. Mr. Singhal has advised that he believes this claim to be without merit and that he intends to dispute it vigorously.
>
> Fredy Bush added, "We wish Shelly the best and are grateful to him for his efforts on behalf of Xinhua Finance. During his time with Xinhua Finance, we believe Shelly has conducted himself with integrity and professionalism. In the meantime, we look forward to putting this matter behind us and focusing on what we do best-continuing to build our business in China and creating value for our shareholders".

31.    Investors would soon know the true significance of the Singhal departure - - and they would also learn of the protest departures of Lynn E. Turner and Jonathan Weil - - after *Barron's*

21

published an expose that revealed Singhal had a long history of alleged fraud, stock manipulation

and organized corruption.  The report published by *Barron's* stated the following:

**Barron's**

May 21, 2007 Monday

**HEADLINE:** Ignoring an Inconvenient Truth

Asian business media tapped Fredy Bush as the "entrepreneur of the year" last October for building her Xinhua Finance into a Chinese media and financial information powerhouse.

In just seven years, Xinhua has become a kind of McGraw-Hill of China -- with financial news services, stock indexes and ratings agencies. Listed in Tokyo, Bush's company's raised $300 million in March in a U.S. offering on behalf of its Xinhua Finance Media unit (ticker: XFML). Xinhua Finance has collected some influential U.S. assets this year, including the hard-hitting proxy advisory firm Glass Lewis that's staffed with veterans of the Securities and Exchange Commission and the Wall Street Journal . . . or at least it was until last week.

That's when two of the most prestigious staffers at Glass Lewis resigned after apparently concluding that their new parent company, Xinhua Finance, would have flunked a Glass Lewis review of its corporate transparency. It turns out that Xinhua Finance Media's IPO prospectus failed to mention some awkward facts about the company's then-chief financial officer, Shelly Singhal.

The 39-year-old Singhal was simultaneously the company's CFO and an investment banker and stock broker who runs the Newport Beach, Calif., firm Bedrock Securities. And since April 2006, Singhal's firm has been under a cease- and-desist order from the National Association of Securities Dealers, as the regulators seek to suspend Bedrock for violating several SEC rules. I called Bedrock, but no one returned my message.

Singhal's name actually came up in Barron's May 7 issue ("New Controversy for iMergent"), where we reported that he was fighting a private civil racketeering suit in California courts for his investment activities. He got involved with Xinhua Finance as a major investor in 2003. He had previously been a major investor in a couple of companies called AremisSoft and ACLN -- which turned out to be outrageous frauds.

By coincidence, perhaps, our mention of Singhal on May 7 was followed Tuesday by a Xinhua Finance Media announcement that Singhal was moving from his role as chief financial officer of the U.S.-listed unit to become head of corporate development for the Cayman Island-based parent company's capital markets

activities. Taking his place as CFO was David Wang, who had worked for Singhal's brokerage firm and investment bank.

Friday, Glass Lewis' head of research, Lynn E. Turner, resigned. Before joining Glass Lewis, Turner had been arguably the best accounting regulator to serve at the Securities and Exchange Commission. Wednesday, Glass Lewis' managing director and research editor, Jonathan Weil, resigned. He had come to the proxy advisory firm from the Wall Street Journal, where he was the first reporter to blow the whistle on Enron.

"I am uncomfortable with and deeply disturbed," Weil said in his resignation letter, "by the conduct, background and activities of our new parent company Xinhua Finance Ltd., its senior management, and its directors. To protect my reputation, I no longer can be associated with Glass Lewis or Xinhua Finance."

Shortly after I called Xinhua Finance Friday afternoon to ask about Singhal, the company put out a press release announcing that he was resigning from the boards of both Xinhua Finance and its Nasdaq-listed subsidiary, and also leaving his management positions. "It is a difficult decision to leave these two Companies that I have helped to grow," he said in the announcement, "but there are other priorities that will require my full attention, so it is clearly the right thing to do now."

A few moments later, I was on the phone with Xinhua Finance CEO Freddy Bush. She praised Singhal's skills at dealing with regulatory regimes in the U.S., Japan and China. "Shelly's got some very unique skills," she said.

I asked if she'd known about the NASD action against Singhal's brokerage firm when putting together a prospectus for Xinhua Finance Media that omitted that fact. After a long speech about how she had relied on the best advice of the company's underwriters and lawyers, she acknowledged that, "yes," she had known about the NASD problems of Singhal's brokerage firm. Her legal advisers told her, she said, that the prospectus didn't have to make that disclosure.

"Shelly continues to believe that these allegations are without merit," she continued. She also pointed out that Xinhua Finance has thousands of employees in more than a dozen countries. And even the proxy adviser Glass Lewis will survive the resignations of its marquee names, she asserted. "Glass Lewis has a very large group of incredibly talented people. Their product is world-class."

32.　　The combination of defendant Singhal's unscheduled sudden departure, the

realization that Lynne E. Turner and Jonathan Weil had resigned from the Company's subsidiary in

protest over the omissions related to Singhal, and the fact that defendants had known about Singhal's

past and had omitted it from the Prospectus decimated the price of Company stock. Accordingly, as shares resumed trading on Monday, May 21, 2007, Xinhua's ADS shares immediately fell an additional 16% off an already depressed share price, to trade at a new all-time low of $8.31 per share. Moreover, despite having gone public only weeks before at $13.00 per share, this share price decline represented a loss of over 36% from the IPO Offering price.

## CAUSATION AND ECONOMIC LOSS

33.    In connection with the March 2007 Xinhua IPO, defendants signed a materially false and misleading Registration Statement and filed with the SEC and made available to shareholders a materially false and misleading Prospectus. These filings were essential in allowing defendants to complete the Initial Public Offering of over 23.076 million Xinhua shares and raise approximately $300 million, and to create a public market for trading in Company stock, immediately thereafter.

34.    On May 21, 2007, after defendants' prior misrepresentations and illegal and improper conduct came to be revealed and was apparent to investors, shares of Xinhua declined precipitously - - evidence that the prior artificial inflation in the price of Company shares was eradicated. As a result of their purchases of Xinhua stock in connection with the IPO, including those who purchase shares traceable to the Offering in the public markets immediately thereafter, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

35.    By improperly characterizing the Company's business and prospects, and by failing to reveal the true background of defendant Singhal, the defendants presented a misleading image of Xinhua's operations, business, controls and foreseeable prospects. Within the IPO Prospectus and Registration Statement and in road-show presentations made by defendants immediately thereto, *defendants repeatedly emphasized the ability of the Company to provide high-quality management and further stated that this was one of the key strengths of the Xinhua operations*. These claims

24

caused and maintained the artificial inflation in Xinhua's stock at the time of the March 2007 IPO, and thereafter until the truth about the Company was ultimately revealed to investors.

36.     Defendants' false and materially misleading statements caused Xinhua shares to trade at artificially inflated levels from the time of the IPO, when they were offered at $13.00 per share, and thereafter until the truth about defendant Singhal and the Company was reported and exposed by *Barron's* in late-May 2007.

37.     On May 21, 2007, however, after investors learned the truth about defendant Singhal's unscheduled sudden departure, and after they realized that Lynne E. Turner and Jonathan Weil had resigned from the Company's subsidiary in protest over the omissions related to Singhal, and after investors learned that defendants had known about Singhal's past and had omitted it from the Prospectus, the price of Company shares collapsed. Thus, investors' realization of the material omissions caused by defendants not to be included in the March 2007 IPO Prospectus and Registration Statement had an immediate, adverse impact on the price of Xinhua securities.

38.     These belated revelations also evidenced defendants' prior misrepresentation of Xinhua's operations and business prospects due to defendants' false statements. As investors and the market ultimately learned, the Company's controls, procedures, and prior business prospects had been overstated and misreported. As this adverse information became known to investors, the prior artificial inflation was immediately eliminated from Xinhua's share price, and shareholders were damaged as a result of this related share price decline.

39.     As a direct result of investors learning the truth about the Company, on May 21, 2007, Xinhua's stock price collapsed to a record low of $8.31 per share, compared to the IPO Offering price of $13.00 per share - - a decline of over 36% compared to the IPO price and a decline of over 18% compared to the trading price of Xinhua prior to this news reaching the markets. This

25

dramatic share price decline eradicated much of the artificial inflation from Xinhua's share price, causing real economic loss to investors who purchased this stock in, or in connection with, the Xinhua IPO.

40.    In sum, as the truth about defendants' misrepresentations and illegal course of conduct became known to investors, and as the artificial inflation in the price of Xinhua shares was eliminated, plaintiff and the other members of the Class were damaged, suffering an economic loss of approximately $5.00 per share.

41.    The decline in Xinhua's stock price following the departure of defendant Singhal and following publication of the *Barron's* expose, was a direct result that the nature and extent of defendants' misrepresentations and omissions contained in the IPO Prospectus became known to investors and to the market.  The timing and magnitude of Xinhua's stock price decline the following day, when trading resumed, negates any inference that the losses suffered by plaintiff and the other members of the Class were caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' illegal conduct.  During the same period in which Xinhua's share price fell over 18% as a result of defendants' misrepresentations and omissions being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

42.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of defendants' prior misstatements and omissions being revealed.

## CLASS ACTION ALLEGATIONS

26

43.    This is a class action on behalf of all persons who purchased Xinhua shares, or traceable stock, pursuant to the March 2007 Registration Statement and Prospectus (the "Class"), excluding defendants. Class members are so numerous that joinder of them all is impracticable.

44.    Common questions of law and fact predominate and include whether defendants: (i) violated the Securities Act; (ii) whether the Xinhua IPO Registration Statement and Prospectus misrepresented material facts; and (iii) the extent of and appropriate measure of damages.

45.    Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIM FOR RELIEF

### For Violations of §11 of the Securities Act Against
### All Defendants and §15 of the Securities Act Against Defendants

46.    Plaintiff incorporates each and every allegation above as if stated herein.

47.    The Individual Defendants each signed and/or assisted in the preparation of Xinhua's IPO Registration Statement and/or filed that Prospectus with the SEC and distributed it to investors. The Underwriter Defendants each permitted their names to be included on the cover of the Prospectus as the Underwriters.

48.    On or about March 9, 2007, the defendants named in this Claim for Relief completed an IPO of over 23.076 million ADS shares of Xinhua stock - - including the 17.307 million shares sold by Company and 5.769 million shares sold by Company insiders - - at $13.00 per share, for total proceeds of approximately $300 million.

27

49.    Each of the statements alleged herein relating to Xinhua's prospects and operations made in the March 2007 Prospectus and Registration Statement were false or misleading when issued. The true but concealed facts were that defendant Singhal had a long history of alleged stock manipulation, securities fraud and RICO violations that had already resulted in a string of law suits and regulatory enforcement actions - - including several shareholder class actions related to Company's, in which he was also an early stage investor, a RICO civil suit and a Cease and Desist Order made by the NASD - - and that Lynne E. Turner and Jonathan Weil had resigned from the Company's subsidiary in protest over the omissions related to Singhal. In addition, at that time, investors also first learned that defendants had long-known about Singhal's past and had omitted it from the Prospectus and IPO Offering documents.

50.    All defendants named in this Claim for Relief, with the exception of Xinhua, the issuer (whose liability for the misstatements is absolute), owed to the purchasers of the stock, including plaintiff and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time it became effective, to assure that those statements were true and that there was no omission to state material facts required to be stated in order to make the statements contained therein not misleading.

51.    The officers and directors of Xinhua who were signatories to the Registration Statement and the Underwriter Defendants were responsible for the preparation of the Prospectus and the Registration Statement. By virtue of the material misrepresentations contained in the Registration Statement and Prospectus, plaintiff and the Class have been damaged.

52.    By reason of the conduct herein alleged, each defendant named in this Claim for Relief violated §11 of the Securities Act. Defendants Bush and Singhal, and the other members of

the Company's Board of Directors, by reason of their stock ownership and positions with Xinhua, were controlling persons of Xinhua and are liable under §15 of the Securities Act.

## PRAYER

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; and such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 23, 2007

Michael A. Swick (MS-9970)
Kim E. Miller (KM-6996)
**KAHN GAUTHIER SWICK, LLC**
12 East 41th Street – 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

- and -

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff & the Class**

29

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

_Leo Yen_____ (name) ( laintiff? declares, as to the claims asserted under the federal securities law, that:

1.      Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.      Plaintiff did not purchase securities of Xinhua Finance Media Ltd. at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      During the Class Period, plaintiff has executed transactions in the securities of Xinhua Finance Media Ltd. as follows. See Attached Schedule.

5.      In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.      Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: _May 22nd_____, 2007

_____
Plaintiff

**Leo Yen**      **List of Xinhua Finance Media, Ltd. Transactions**

| Date | Purchases | Price | Total |
|------|-----------|-------|-------|
| 4/5/2007 | 17500 | $ 10.14 | $ 177,450.00 |
| 4/26/2007 | 5100 | $ 10.11 | $ 51,561.00 |
| 4/26/2007 | 1900 | $ 10.09 | $ 19,171.00 |